UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| GAVEN MCKENNA and <br> JARED MCKENNA, <br> by and through their co-Guardians <br> Steven and Catherine McKenna, <br><br> Plaintiffs, <br><br> v. <br><br> MAINE DEPARTMENT OF HEALTH <br> AND HUMAN SERVICES, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Docket No. 2:23-cv-00366-NT <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**ORDER ON DEFENDANT'S MOTION TO DISMISS**

Before me is the Defendant's Motion to Dismiss the Plaintiffs' Complaint (ECF No. 8). For the reasons stated below, I **GRANT** the motion.

**FACTUAL BACKGROUND**

Gaven and Jared McKenna (the "**Plaintiffs**") are adult brothers who live with their parents Steven ("**Steve**")[1] and Catherine ("**Kerri**") McKenna (together, the "**McKennas**") in Shapleigh, Maine. Compl. ¶¶ 1, 3, 11 (ECF No. 1). Gaven has been diagnosed with autism and moderate-to-severe intellectual disabilities. Compl. ¶ 9. He is nonverbal and incontinent of bowel and bladder. Compl. ¶ 9. Jared has been diagnosed with autism, moderate intellectual disabilities, and generalized anxiety disorder. Compl. ¶ 10. Gaven and Jared each require assistance with all activities of

---

[1] I use first names in this Order, as the Plaintiffs and their parents share a last name.

daily living and around-the-clock supervision to ensure their health and safety. Compl. ¶ 12.

Gaven and Jared both qualify for "Shared Living Services," which is a Medicaid Home and Community-Based Service waiver program, administered by the Maine Department of Health & Human Services ("**DHHS**") through MaineCare. Compl. ¶¶ 13–16. Shared Living Services are available to MaineCare members with intellectual disabilities or autism who are eligible for an institutional level of care, but instead choose to receive services in a community-based setting. Compl. ¶ 13. Steve and Kerri McKenna are each certified as a "Direct Support Professional" ("**DSP**"), meaning they can be reimbursed by DHHS for providing Shared Living Services. Compl. ¶¶ 19, 25.

Both Plaintiffs qualify for Shared Living Services at a level of service known as "Single Member Served," which is when one DSP serves only one member. Compl. ¶¶ 16, 24. In August of 2018, DHHS approved Kerri as Jared's DSP to provide Single Member Served level services in their family home. Compl. ¶ 21. The reimbursement rate for this level of service is $156 per diem. Compl. ¶ 25. In May of 2019, the family applied for Gaven, like Jared, to receive care at home at the Single Member Served level, with Steve as Gaven's DSP. Compl. ¶ 22. But in August of 2019, the Plaintiffs received notice that because they lived together, DHHS had approved them for a different service level: "Shared Living, two members served." Compl. ¶ 23. At this level of service, one DSP serves two members simultaneously; in other words, it is a two-on-one rather than a one-on-one arrangement. Compl. ¶ 24. The reimbursement

2

rate for Shared Living, two members served is $78.02 per diem. Compl. ¶ 25. Notwithstanding DHHS's decision, Steve and Kerri continued to act as DSPs to their children at a Single Member Served level of care. Compl. ¶ 33. This meant the McKennas received the same amount from DHHS to care for both Gaven *and* Jared as they had been receiving to care just for Jared. Compl. ¶¶ 21, 23, 25–26, 33.

DHHS based its decision—that Gaven and Jared could not both receive Single Member Served level support in the same home—on the following regulation from the MaineCare Benefits Manual:

> Shared Living (Foster Care-adult) is a model in which services are provided to a member by a person who meets all of the requirements of a [DSP] with whom that member shares a home . . . . Only one member may receive services in any one Shared Living arrangement at the same time unless a relationship existed prior to the service arrangement and the arrangement is approved by DHHS. In such case, no more than two members may be served in any one Shared Living arrangement concurrently.

Compl. ¶¶ 27–28.[2] DHHS reached this decision by interpreting the term "arrangement" to mean "home" rather than the service relationship between the member and DSP. Compl. ¶ 29. From this interpretation, DHHS determined that Gaven and Jared could not both receive Single Member Served care while living under the same roof. Compl. ¶¶ 30–31.

---

[2] I have quoted this provision of the MaineCare Benefits Manual as it appears in the Plaintiffs' Complaint. The Plaintiffs cite Chapter II, Section 21.02-28 of the MaineCare Benefits Manual as the source of this provision. I infer that the Plaintiffs meant, however, to cite Chapter II, Section 29.02-25, because that is the section that contained the relevant "[o]nly one member may receive services in any one Share Living arrangement" language. *See* Me. Code R. 10-144, Ch. 101, ch. II § 29.02-25 (2019). I note that this section of the MaineCare Benefits Manual has since been renumbered, and the "[o]nly one member" language has been revised. *See* Me. Code R. 10-144, ch. II § 29.05-12 (2024).

3

In 2020, Steve and Kerri challenged DHHS's interpretation of this regulation by filing suit in the Maine Superior Court for York County under the Maine Administrative Procedures Act and Rule 80C of the Maine Rules of Civil Procedure ("**Rule 80C**"). Compl. ¶ 34. The Superior Court agreed that DHHS's interpretation of the regulation was "arbitrary, unreasonable, and inconsistent" with the policy of "maximizing community inclusion in a Shared Living family environment." Compl. ¶ 35. The Superior Court ordered DHHS to approve both Gaven and Jared for services at the Single Member Served level within the same home, and DHHS has complied with that order. Compl. ¶¶ 35–36. Gaven and Jared continue to live together with their parents, as they have throughout this dispute. Compl. ¶ 11.

In September of 2023, Gaven and Jared filed suit in this Court seeking relief for the period when DHHS reimbursed them for care from one DSP at the Two Members Served rate (rather than from two DSPs at the Single Member Served rate). Compl. at 1–2, 11. Specifically, they assert that by denying services they were otherwise entitled to receive, DHHS discriminated against each of them based on their association with an individual with a disability, in violation of Title II of the Americans with Disabilities Act ("**ADA**"), 42 U.S.C. § 12132 (Count I), and the Maine Human Rights Act ("**MHRA**"), 5 M.R.S. § 4592(6) (Count II). Compl. ¶¶ 37–44. DHHS has moved to dismiss their Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Def.'s Mot. to Dismiss ("**Def.'s Mot.**") (ECF No. 8).

4

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b), a party may move to dismiss a complaint for "lack of subject-matter jurisdiction" or "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(1), (6). In reviewing such motions, I accept all well-pleaded facts as true and draw all reasonable inferences in the nonmoving party's favor. *Squeri v. Mount Ida Coll.*, 954 F.3d 56, 61 (1st Cir. 2020) (applying Rule 12(b)(6)); *Aversa v. United States*, 99 F.3d 1200, 1210 (1st Cir. 1996) (applying Rule 12(b)(1)); *see Lyman v. Baker*, 954 F.3d 351, 359–60 (1st Cir. 2020) (noting the First Circuit applies "the same basic principles" when reviewing dismissals under Rules 12(b)(1) and 12(b)(6)). "When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." *Ne. Erectors Ass'n of BTEA v. Sec'y of Lab.*, 62 F.3d 37, 39 (1st Cir. 1995).

## DISCUSSION

### I. The Plaintiffs' Title II ADA Claim (Count I)

I begin with DHHS's motion to dismiss under Rule 12(b)(1). DHHS asserts that the Plaintiffs' Title II claim should be dismissed because it is barred by the Eleventh Amendment of the United States Constitution and principles of sovereign immunity. Def.'s Mot. 8–20.[3] The Plaintiffs counter that Congress has properly abrogated

---

[3] DHHS's sovereign immunity argument is a jurisdictional challenge under Federal Rule of Civil Procedure 12(b)(1). Def.'s Mot. to Dismiss 2 (ECF No. 8)

DHHS's sovereign immunity as to that claim. Pls.' Opp'n to Def.'s Mot. to Dismiss ("**Pls.' Opp'n**") 7–19 (ECF No. 14).

Under the Eleventh Amendment, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. This amendment "guarantees that private individuals may not sue nonconsenting states in federal court." *Toledo v. Sánchez*, 454 F.3d 24, 31 (1st Cir. 2006) (citation omitted). This guarantee extends to unconsented suits against states by their own citizens. *Tennessee v. Lane*, 541 U.S. 509, 517 (2004) (citation omitted).

The parties agree that the Plaintiffs bear the burden of demonstrating that this Court has subject-matter jurisdiction over their dispute. Def.'s Mot. 2; Pls.' Opp'n 6. The parties are basically correct, though there is some nuance to this general rule in the sovereign immunity context. The party asserting sovereign immunity bears the initial burden of proving that it is either a state or an "arm of the state." *Pastrana-Torres v. Corporación de Puerto Rico para la Difusión Pública*, 460 F.3d 124, 126 (1st Cir. 2006) (citation omitted); *accord Soscia Holdings, LLC v. Rhode Island*, 677 F. Supp. 3d 55, 66 (D.R.I. 2023). Once it does, "the plaintiff bears the burden to show that an exception to sovereign immunity applies." *Soscia*, 677 F. Supp. 3d at 66 (citation omitted); *accord D'Agostino v. Ariz. Dep't of Econ. Sec.*, 623 F. Supp. 3d 1009, 1012 (D. Ariz. 2022).

6

Here, DHHS asserts it is entitled to sovereign immunity as an "arm of the state," Def.'s Mot. 9, and the Plaintiffs do not object.[4] Accordingly, the Plaintiffs must show that an exception to sovereign immunity applies. Their asserted exception is that Congress has validly abrogated DHHS's sovereign immunity with respect to the Plaintiffs' Title II claim. Pls.' Opp'n 7–9.

Congress may abrogate state sovereign immunity by (1) "unequivocally expressing its intent" to do so; and (2) "act[ing] pursuant to a valid exercise of its power." *Toledo*, 454 F.3d at 31 (citations and quotation marks omitted). The first requirement is met here: Title II of the ADA says that "[a] State shall not be immune under the eleventh amendment . . . from an action in Federal or State court . . . for a violation of this chapter." 42 U.S.C. § 12202.

The second requirement poses a more challenging question. "Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under [Section] 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment." *Buchanan v. Maine*, 469 F.3d 158, 172 (1st Cir. 2006) (alteration in original) (quoting *Lane*, 541 U.S. at 518). To determine whether Congress acted with the proper constitutional authority, I must follow a multistep process. First, I assess whether the Plaintiffs have stated a claim under Title II of the ADA. *Id.* If no, the claim is dismissed. *Id.* at 172–73. If yes, I move to the second step,

---

[4] Moreover, courts in this District have held that DHHS is an arm of the state for Eleventh Amendment purposes. *See, e.g.*, *Marr v. Me. Dept. of Hum. Servs.*, No. 01-224-B-C, 2002 WL 737651, at \*2 (D. Me. Apr. 24, 2002), *aff'd sub nom. Marr v. Me. Dep't of Hum. Servs.*, No. CIV. 01-224-B-C, 2002 WL 1461826 (D. Me. July 9, 2002).

7

which is whether the conduct alleged also violated the Fourteenth Amendment. *Toledo*, 454 F.3d at 31. If yes, I stop there: Congress has acted pursuant to a valid exercise of its constitutional power. *United States v. Georgia*, 546 U.S. 151, 159 (2006) ("[I]nsofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."). If no, I proceed to the third step, which is whether Congress's purported abrogation of sovereign immunity as to conduct that violated Title II but not the Fourteenth Amendment is nevertheless valid. *Toledo*, 454 F.3d at 31. If yes, Congress has validly abrogated sovereign immunity; otherwise, it has not. *Id.*

### A.   Have the Plaintiffs Stated a Title II ADA Claim?

As described above, to determine if Congress has acted with proper constitutional authority, the first step is to assess whether the Plaintiffs have stated a claim. *Buchanan*, 469 F.3d at 172. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II's implementing regulations clarify that the statute bars associational discrimination—that is, discrimination based on someone's "relationship or association" with people with disabilities. 28 C.F.R. § 35.130(g); *see also CRC Health Grp., Inc. v. Town of Warren*, No. 2:11-cv-196-DBH, 2013 WL 607912, at *1–2 (D. Me. Feb. 19, 2013) (recognizing "associational discrimination" claims under Title II). To state such a claim, the Plaintiffs must plausibly allege that (1) they have a "logical

8

and significant association" with a person with a disability; (2) "a public entity knew of that association"; (3) "the public entity discriminated against them because of that association"; and (4) "they suffered a direct injury as a result." *S.K. v. N. Allegheny Sch. Dist.*, 146 F. Supp. 3d 700, 712 (W.D. Pa. 2015) (citation and quotation marks omitted).

Taking all well-pleaded facts as true and drawing all reasonable inferences in the Plaintiffs' favor, I find they plausibly allege a Title II associational discrimination claim. The Plaintiffs are people with disabilities under the ADA who share a logical and significant association as brothers living together in their family home. DHHS knew about their familial relationship and living arrangement. And, though both Plaintiffs qualify for Shared Living Services at the Single Member Served level, DHHS denied them those services because they live together. As a result, they were reimbursed at half the rate they should have received. These allegations are sufficient to state a claim for associational discrimination. Because the Plaintiffs have stated a claim under Title II, I proceed to the next step.

### B. Does the Alleged Conduct Violate the Fourteenth Amendment?

The second step is whether DHHS's alleged conduct violated the Fourteenth Amendment. The Plaintiffs maintain that DHHS's denial of services at the Single Member Served level violated their substantive due process and equal protection rights under the Fourteenth Amendment. Pls.' Opp'n 9–15. I take each in turn.

#### 1. Substantive Due Process

"In order to assert a valid substantive due process claim, [Plaintiffs] have to prove that they suffered the deprivation of an established life, liberty, or property

9

interest *and* that such deprivation occurred through governmental action that shocks the conscience." *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008).

For the first requirement, I have carefully analyzed the parties' arguments and legal support, and am skeptical that the Plaintiffs have identified a deprivation of an established liberty or property interest based on DHHS's denial of services at the Single Member Served level. *See* Def.'s Mot. 11–14; Pls.' Opp'n 9–12. However, I need not decide that issue, because the Plaintiffs have not identified conduct by DHHS that shocks the conscience.

For the second requirement, the First Circuit has acknowledged that the "shocks the conscience" test is difficult to define. *González-Fuentes v. Molina*, 607 F.3d 864, 880 (1st Cir. 2010). It has, however, recognized the following standards:

> It is well established that negligence, without more, is simply insufficient to meet the conscience-shocking standard, while intent to injure in some way unjustifiable by any government interest is likely sufficient. Anything between those two poles is a matter for closer calls. A hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.

*Id.* at 881 (citations and punctuation omitted). The Plaintiffs identified the shocks-the-conscience requirement in their brief, Pls.' Opp'n 10, but made no argument that DHHS's conduct met that standard. That omission could be reason enough to find that they did not carry their burden on the shocks-the-conscience requirement. *See generally Perna v. Martinez*, No. 17-11643-IT, 2018 WL 4519361, at *3 (D. Mass. July 5, 2018) (finding plaintiff's perfunctory mention of sovereign immunity insufficient to

10

meet his burden); *In re Compact Disc Minimum Price Antitrust Litig.*, 456 F. Supp. 2d 131, 152 (D. Me. 2006) ("A party's failure to oppose specific arguments in a motion to dismiss results in waiver of those issues.").

However, I separately find that the conduct alleged—DHHS's reimbursement of services at the Shared Living, two members served level, rather than the Single Member Served level—does not meet the shocks-the-conscience standard. As the Superior Court found, this decision was "arbitrary, unreasonable, and inconsistent with the values espoused by [DHHS] policies of maximizing community inclusion in a Shared Living family environment." Compl. ¶ 35.[5] But I cannot say, based on the allegation in the Complaint, that it was made with an intent to injure unrelated to any government interest, or with any of the other "hallmark[s] of successful challenges," as articulated above. *González-Fuentes*, 607 F.3d at 881. The conduct alleged did not violate the Plaintiffs' substantive due process rights.

## 2. Equal Protection

"The Equal Protection Clause requires states to treat alike all persons similarly situated." *Toledo*, 454 F.3d at 33. The Plaintiffs contend they were treated differently from other people with disabilities qualified to receive Single Member Services level care "because of their choice to live in the same home." Pls.' Opp'n 13. A key question for any equal protection claim is what level of scrutiny applies. "Unless state action burdens a suspect class or impinges upon a fundamental right, we review

---

[5] *See McKenna v. Comm'r Me. Dep't of Health & Hum. Servs.*, Nos. AP-20-005, 006, at *27 (Me. Super. Ct., York Cnty., July 13, 2022) (Douglas, J.).

11

equal protection claims for a rational relationship between the disparity of treatment and a legitimate government purpose." *Toledo*, 454 F.3d at 33.

The parties agree people with disabilities are not a "suspect class" for purposes of equal protection analysis.[6] Def.'s Mot. 14; Pls.' Opp'n 13 n.13; *see also Toledo*, 454 F.3d at 33 ("The disabled are not a suspect class for equal protection purposes."). Instead, the Plaintiffs assert that DHHS's conduct impinged on their "fundamental rights to associate and live with their family members." Pls.' Opp'n 13. But they have not cited any authority that supports that assertion.[7] Moreover, their characterization of the right at issue conflicts with the allegations in their Complaint. They allege that they have always lived together with their parents in their family home. Compl. ¶ 11. They have not alleged any threat to this living arrangement based on the period of time they received reimbursement from DHHS at the Shared Living, two members served level.[8] Even drawing all reasonable inferences in their favor, the

---

[6] Because people with disabilities are not a suspect class for equal protection purposes, I can infer that those who *associate* with people with disabilities are not a suspect class either.

[7] *See* Pls.' Opp'n to Def.'s Mot. to Dismiss ("**Pls.' Opp'n**") 13–14 (ECF No. 14) (citing *Lyng v. Castillo*, 477 U.S. 635 (1986) (reversing a lower court's use of "heightened scrutiny" because a law concerning what counts as a "household" for food stamp benefit purposes did not directly and substantially interfere with family living arrangements and thereby burden a fundamental right); *Zablocki v. Redhail*, 434 U.S. 374 (1978) (applying "critical examination" because the law "infringed upon a fundamental right, the right to marry."); *Toledo v. Sanchez*, 454 F.3d 24 (1st Cir. 2006) (applying rational basis review to educational disability discrimination claim that fell short of "outright exclusion"); *Fox v. Makin*, 2:22-cv-00251-GZS, 2023 WL 5279518 (D. Me. Aug. 16, 2023) (applying strict scrutiny review because the law implicated a fundamental right, the right to free exercise of religion)).

[8] The Plaintiffs make assertions in their brief about what may have happened to their living arrangement if the Superior Court had not ruled in their favor on the Rule 80C motion. Pls.' Opp'n 14. But these assertions are hypothetical and are not properly considered on a motion to dismiss. *See Barrett v. Lombardi*, 239 F.3d 23, 27 (1st Cir. 2001) ("[A]llegations in a lawyer's brief or legal memorandum are insufficient . . . to establish jurisdictional facts.").

Plaintiffs have not plausibly alleged that receiving a lower reimbursement rate from DHHS impinged on their fundamental rights.

Accordingly, DHHS's conduct triggers only rational basis review, meaning it "must be rationally related to a legitimate government purpose." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). Equal protection claims subject to rational basis review face strong headwinds. Courts must "accept as adequate any plausible factual basis without regard to [the legislature's] actual motives," and legislative "[m]eans need not be narrowly drawn to meet—or even be entirely consistent with—the stated legislative ends." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 9 (1st Cir. 2012). Cost-saving is considered a legitimate government purpose, and courts defer to legislative decisions about "mak[ing] allocations from a finite pool of resources" because "the discretion about how best to spend money to improve the general welfare is lodged in [the legislature] rather than the courts." *Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW*, 485 U.S. 360, 373 (1988).

Here, DHHS cites cost-saving as a reason to allow only one Single Member Served level reimbursement per home. Def.'s Mot. 15; Def.'s Reply Mem. in Supp. of Mot. to Dismiss 5 (ECF No. 17). The Plaintiffs counter that had the Superior Court not granted their Rule 80C appeal, one of them might have had to move to an institution, "a far more expensive outcome for the state than the cost of Single Member Services." Pls.' Opp'n 14. Setting aside the hypothetical nature of this argument, it is difficult to see how it differs from any number of legislative funding

choices. For example, a city may spend less overall by housing those in need than by providing services and managing its unhoused population on a daily basis. But the wisdom of that decision is left to elected officials as selected by voters; it is not for a court to overturn on rational basis review. As noted above, I must afford deference to the government's decisions on how best to promote the general welfare from a limited pool of resources. Under this deferential level of review, DHHS's conduct does not amount to an equal protection violation.

Because the Plaintiffs have not demonstrated that DHHS's conduct violated the Fourteenth Amendment, I move on to the third step.

### C. Is Congress's Purported Abrogation as to Conduct That Violates Title II But Not the Fourteenth Amendment Valid?

The third step in evaluating whether Congress abrogated sovereign immunity pursuant to a valid exercise of constitutional authority is to determine, "insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation . . . is nevertheless valid." *Georgia*, 546 U.S. at 159. This step comes from the Supreme Court's opinion in *City of Boerne v. Flores*, which explains that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress'[s] enforcement power even if . . . it prohibits conduct which is not itself unconstitutional and intrudes into legislative spheres of autonomy previously reserved to the States." 521 U.S. 507, 518 (1997). This inquiry involves another multipart test:

> To determine whether prophylactic legislation under § 5 is valid, a court must consider: (1) the constitutional right or rights that Congress sought to protect when it enacted the statute; (2) whether there was a history of constitutional violations to support Congress's determination that

> prophylactic legislation was necessary; and (3) whether the statute is a congruent and proportional response to the history and pattern of constitutional violations.

*Toledo*, 454 F.3d at 34–35. As noted above, because it is the Plaintiffs' burden to demonstrate that Congress has abrogated sovereign immunity, they must show that the *City of Boerne* test is met.

Before delving into this test, I must identify "the particular category of state conduct at issue." *Id.* at 35. Because "Title II 'reaches a wide array of official conduct in an effort to enforce an equally wide array of constitutional guarantees' . . . [t]he history of discrimination and the need for prophylaxis will vary greatly in these different contexts." *Id.* (quoting *Lane*, 541 U.S. at 530). For that reason, I must consider "the specific constitutional rights and the history of constitutional violations in the particular area . . . to determine the congruence and proportionality of Title II's measures in that area." *Id.*

Here, DHHS identifies the category of conduct as: "[DHHS]'s provision of Medicaid-funded services." Def.'s Mot. 16. The Plaintiffs identify it as: "the provision of state services." Pls.' Opp'n 17. In *Toledo*, faced with the parties' conflicting levels of generality on the category of state conduct ("the conduct of public universities" versus "government conduct at all levels of public education"), the First Circuit defined the category as "public education in general." 454 F.3d at 36. The First Circuit's analysis in *Toledo* indicates that defining the category too narrowly may run afoul of Supreme Court precedent. *Id.* at 36 (explaining that the category in *Lane*, "accessibility of judicial services," included conduct beyond the facts of the case).

Following this guidance, I find that the Plaintiffs have proposed the appropriate category of conduct: the provision of state services.

I pause here to explain what the category is not. The Plaintiffs identify this country's shameful history of state institutionalization and isolation of people with disabilities.[9] Pls.' Opp'n 17. In *Tennessee v. Lane*, the Supreme Court specifically identified the "unconstitutional treatment of disabled persons by state agencies . . . including unjustified commitment . . . [and] the abuse and neglect of persons committed to state mental health hospitals" in identifying a harm Title II was enacted to address. 541 U.S. at 524–25. But the state conduct alleged here, providing reimbursement at the Shared Living, two members served, rather than Single Member Served level, does not sufficiently implicate this category. The Plaintiffs do not allege that they were ever institutionalized or faced a threat of institutionalization.[10] Moreover, they now each receive benefits at the Single Member Served level. This observation is in no way meant to minimize what was undoubtedly a difficult period for the McKennas, when they had to make do on significantly diminished benefits. However, the Complaint does not allege that DHHS unjustifiably institutionalized the Plaintiffs or threatened their ability to live at home with their family. *Cf. Lewis v. N. Mex. Dept. of Health*, 94 F. Supp. 2d 1217, at 1228 (D.N.M. 2000) (finding Congress validly abrogated sovereign immunity for claims by

---

[9] While they identify this history, the Plaintiffs do not argue that state institutionalization and isolation of individuals with disabilities is the category of state conduct at issue in this case. Pls.' Opp'n 17–18.

[10] *See supra* n.8.

16

disabled people living in an institutional setting who claimed the state violated Title II by not providing community-based care under Medicaid). On different facts, the category of state conduct could be construed as unjustified institutionalization, but here, without any allegation of actual or threatened institutionalization, DHHS's conduct does not fit that category.

Having identified the category of conduct, I proceed to the three-part *City of Boerne* test. The first step is identifying the constitutional rights Congress sought to protect when it enacted Title II and applying it to the provision of state services. *See Toledo*, 454 F.3d at 36. The Plaintiffs emphasize that a goal of Title II is to guarantee " 'meaningful access to governmental benefits and programs, which broadly means that public entities must take reasonable steps to ensure that individuals with disabilities can take advantage of such public undertakings.' " Pls.' Opp'n 16–17 (quoting *Kelley v. Mayhew*, 973 F. Supp. 2d 31, 36 (D. Me. 2013)). They do not, however, tie this goal to any particular constitutional rights. Unlike the situation in *Toledo*, where the First Circuit noted that "[t]he Supreme Court's Equal Protection Clause and Due Process Clause jurisprudence places a special emphasis on the constitutional rights implicated by discrimination in public education, and Title II seeks to enforce those rights by prohibiting discrimination against the disabled and providing for accommodations of their special needs," 454 F.3d 36, the Plaintiffs have not pointed to any similar tie between specific constitutional rights and the denial of state services to those who associate with people with disabilities. Nor have I come

17

across any such authority. The Plaintiffs have not carried their burden on this first *City of Boerne* step.

Assuming the Plaintiffs identified specific constitutional rights, the next step would be to "consider whether there is a history of a violation of those rights by the states" and "how grave and how widespread the constitutional violations were in order to judge the appropriateness of prophylactic legislation." *Toledo*, 454 F.3d at 37. The Plaintiffs make general observations about a history of discrimination against people with disabilities in the provision of public services. Pls.' Opp'n 18. But because the Supreme Court has not already identified a history of such constitutional violations, the Plaintiffs' general observations are not enough.[11] The Plaintiffs also offer specific historical examples of states institutionalizing people with disabilities. Pls.' Opp'n 17–18. But as explained above, state institutionalization is not the category of conduct at issue in this case. The Plaintiffs have not carried their burden on this second step.

Because the Plaintiffs fail to identify a history or pattern of constitutional violations in the provision of state services, the third *City of Boerne* step requires little discussion. The Plaintiffs have not shown that Title II, as applied to DHHS's alleged conduct, is "a congruent and proportional response to a history and pattern of constitutional violations." *Toledo*, 454 F.3d at 34–35.

---

[11] In the Supreme Court's *City of Boerne* analysis in *Tennessee v. Lane*, it discussed a "range of constitutional guarantees implicated by Title II and the history of constitutional violations in all areas of public services, including health care, state mental institutions, zoning, marriage, jury service, transportation, the penal system, public education, access to the judicial system, and voting." *Toledo*, 454 F.3d at 35 (citing *Tennessee v. Lane*, 541 U.S. 509, 522–26 (2004)).

18

In sum, the Plaintiffs have not carried their burden on the *City of Boerne* test. This means they have not demonstrated that "Congress acted pursuant to a valid grant of constitutional authority" with respect to their particular Title II claim. *Lane*, 541 U.S. at 517 (internal citation and quotation marks omitted). Therefore, Congress did not validly abrogate state sovereign immunity, and the Plaintiffs' Title II claim must be dismissed.[12]

## II. The Plaintiffs' MHRA Claim (Count II)

In addition to their federal claim under Title II (Count I), the Plaintiffs also bring a parallel state claim under the MHRA (Count II). Compl. ¶¶ 42–44. Both sides agree that this state law claim does not belong in federal court. Def.'s Mot. to Dismiss 20; Pls.' Opp'n 20. Absent federal jurisdiction, I therefore dismiss the MHRA claim, without prejudice, so that the Plaintiffs may seek relief in state court.

## CONCLUSION

For the reasons stated above, I **GRANT** the Defendant's Motion to Dismiss the Plaintiffs' Complaint (ECF No. 8).

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 27th day of September, 2024.

---

[12] Because DHHS has prevailed on the Rule 12(b)(1) portion of its motion, I do not address its Rule 12(b)(6) arguments.

19